*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————————

**UNITED STATES**
Appellee

**v.**

**Brandon G. DARNALL, Hospitalman**
United States Navy, Appellant

**No. 16-0729**
Crim. App. No. 201500010

Argued May 10, 2017—Decided June 28, 2017

Military Judge: Leon J. Francis

For Appellant: *Lieutenant Christopher C. McMahon,* USN, JAGC (argued).

For Appellee: *Major Cory A. Carver,* USMC (argued); *Colonel Valerie Danyluk,* USMC, and *Lieutenant James Belforti,* USN, JAGC (on brief).

Judge SPARKS delivered the opinion of the Court, in which Chief Judge ERDMANN, and Judges STUCKY, RYAN, and OHLSON, joined.

———————————

Judge SPARKS delivered the opinion of the Court.

This case arises out of the conviction by members, contrary to his pleas, of Hospitalman (E-3) Brandon G. Darnall (Appellant) of multiple drug-related charges including possession, importation, distribution, manufacture, possession with intent to distribute, attempt to possess with intent to distribute, conspiracy to import and distribute, making false official statements, and misuse of a communications facility—in violation of Articles 81, 107, 112a, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 907, 912a, 934 (2012). Appellant was sentenced to six years of confinement, a dishonorable discharge, and reduction to grade E-1. The convening authority suspended confinement over five years but otherwise approved the findings and sentence. The United States Navy-Marine Corps Court of Criminal Appeals noted a court-martial order error but otherwise affirmed the findings and sentence. We granted review of the following issue:

Whether the military judge erred in failing to suppress evidence directly flowing from the illegal apprehension of Appellant, whether the NMCCA ruling upholding this decision conflated reasonable suspicion with probable cause, and whether this decision should be reversed.

Upon review, we conclude that the Marine Criminal Investigative Division (CID) agents did not have probable cause to apprehend Appellant, and that both the military judge and the lower court erred in failing to suppress the evidence flowing from that apprehension. Accordingly, the decision of the Navy-Marine Corps Court of Criminal Appeals is reversed.

**Facts**

Between October 2011 and March 2012, Appellant imported, manufactured, and distributed controlled substances including steroids and designer drugs, communicating by cell phone (text and other apps) with suppliers in China and customers and middlemen in the United States. Investigators first grew suspicious of Appellant in November 2011 when federal Customs and Border Control agents intercepted a package containing dimethylone[1] sent from China to someone with Appellant's name at an address in the town of Twentynine Palms in San Bernardino County, California, which is home to the Marine Corps Air Ground Combat Center also called Twentynine Palms. The package was labeled with the name Brandon Darnall, the Twentynine Palms address, and a phone number. Thinking the intended recipient might be a servicemember, the agents passed on the package to the Marine CID, who took over the investigation. A search through public records revealed three people named Brandon Darnall in the entire county, one of whom was a servicemember. The CID agent, Agent Pledger, went to the address on the package and found an empty house with a

---

[1] Dimethylone is an analogue of several controlled substances in the cathinone family with effects similar to methylone and to MDMA. Methylone became a schedule I controlled substance in October 2011. Dimethylone became a schedule I controlled substance in March 2014.

"For Rent" sign.[2] Based on the above information, Agent Pledger received permission to have a counterfeit version of the package containing no real drugs delivered to Appellant at the regimental mailroom and to apprehend him after he picked it up. Agent Pledger's stated intent was to see whether Appellant had any visible reaction upon seeing the package, as well as to arrest and question Appellant to determine how he intended to use the dimethylone.[3] At this point, Agent Pledger had not initiated any previous contact with Appellant, nor had he interviewed anyone else in conjunction with the investigation. When Appellant, after receiving a phone call to pick up a package, arrived at the mailroom his only reaction was to appear as though he didn't remember ordering the package. On his way out, he was stopped by three CID officers—one of them with a taser drawn—handcuffed, and escorted to CID offices where he was informed of his rights and waived them. During an interview, he admitted to previously purchasing the drug methylone from China and selling it to local "smoke shops" to make into "spice" and "bath salts," but only before it was listed as a controlled substance in October 2011. His statements were not recorded due to a power outage.

Appellant gave agents permission to search his barracks room and car but not his cell phone. Instead, Agent Pledger took protective possession of Appellant's phone until he was able to obtain oral command authorization later that evening to search it. The search authorization was granted based on information obtained by Agent Pledger during his questioning of Appellant. The phone contained messages, audio and video recordings, and photos all related to Appellant's drug activity, including images of Appellant holding up drugs and large rolls of cash. At Agent Pledger's request, Appellant voluntarily returned to CID offices and was reinterviewed the following day. This interview was

---

[2] A search for prior residents at the address on the package turned up a servicemember, not the Appellant, who later testified at court-martial that Appellant asked to receive packages at his address. However, the lower court's factual determination that it was likely the CID agent was not aware of this at the time of Appellant's arrest was not clearly erroneous.

[3] At the time of Appellant's arrest, dimethylone was considered a controlled substance only if intended for personal consumption.

recorded and his statement was put in writing. A subsequent records review by Customs and Border Protection revealed that in October 2011 another package from China, this one containing methylone and addressed to the same name and Twentynine Palms address, had been intercepted and destroyed.

At an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2012), session conducted on October 31, 2013, Agent Pledger testified that Appellant willingly participated in both interviews. He also testified that in order to obtain an oral search authorization for the cell phone, he informed his battalion commander of the contents of the initial interview with Appellant as well as his own experience and knowledge about how the narcotics trade works. He stated that, had the controlled delivery been denied, they would have simply apprehended Appellant at his place of work and that the investigation would have most likely "sunk" if Appellant had not admitted during the interview that he had been the person intended to receive the package.

The motion to suppress was argued before the military judge twice. In between, the charges were withdrawn and dismissed by the Government and new charges were filed because Appellant elected to withdraw from a pretrial agreement. Appellant, who testified only during the second motion to suppress, contradicted Agent Pledger's account. He testified that he never gave any statement when he was first apprehended and that Agent Pledger had threatened to put him in jail if he got a lawyer. The military judge found Agent Pledger's version of events to be the more credible. The military judge denied the motion to suppress, relying on, among other facts, a factual finding that Appellant had previously lived at the Twentynine Palms address to which the package was addressed.

Upon review, the Navy-Marine Corps Court of Criminal Appeals found the military judge's factual finding that Appellant had previously lived at the address on the package to be clearly erroneous and proceeded to determine whether, absent that fact, there were still sufficient facts to establish probable cause. *United States v. Darnall*, No. NMCCA 201500010, 2016 CCA LEXIS 398, at *8, 2016 WL 3853731, at *3 (N-M. Ct. Crim. App. July 12, 2016) (unpublished). The lower court found that probable cause

did exist but provided minimal analysis for its finding simply stating that:

> At the time of the appellant's arrest, the CID agent had the following facts at his disposal: (1) that Customs and Border Control agents seized a package mailed from China containing more than two pounds of dimethylone, a Schedule I controlled substance analogue; (2) that the package was addressed to "Brandon Darnall" at a rental property near MCAGCC, Twentynine Palms; (3) that there were only three "Brandon Darnalls" located in the entirety of San Bernardino County, California; (4) that the appellant was the only "Brandon Darnall" of the three who was a servicemember; and (5) that the appellant was stationed on board MCAGCC, Twentynine Palms.
>
> We find these facts sufficient to establish probable cause.

*Id.* at \*9–10, 2016 WL 3853731, at \*4.

## Discussion

The central question before this Court is whether Agent Pledger had sufficient information to establish probable cause to apprehend Appellant after he picked up the package. Rule for Courts-Martial (R.C.M.) 302(c) outlines "Grounds for apprehension,"[4] and states that:

> A person subject to the code or trial thereunder may be apprehended for an offense triable by court-martial upon probable cause to apprehend. Probable cause to apprehend exists when there are reasonable grounds to believe that an offense has been or is being committed and the person to be apprehended committed or is committing it.

The R.C.M. 302(a) Discussion further provides that evidence obtained as the result of an apprehension which is in violation of R.C.M. 302 may be challenged as an unlawful search or seizure and excluded under Military Rule of Evidence (M.R.E.) 311(c).

---

[4] R.C.M. 302(a) defines apprehension as "the taking of a person into custody."

5

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court has characterized probable cause as "a fluid concept—turning on the assessment of probabilities in particular factual contexts," and meriting an evaluation of the totality of the circumstances in any given case. *Illinois v. Gates*, 462 U.S. 213, 232 (1983). This Court has stated that "probable cause requires more than bare suspicion, but something less than a preponderance of the evidence." *United States v. Leedy*, 65 M.J. 208, 213 (C.A.A.F. 2007). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). "[P]robable cause is measured at the moment the arrest occurs and must derive from facts and circumstances based on reasonably trustworthy information." *Cortez v. McCauley*, 478 F. 3d 1108, 1121 (10th Cir. 2007); s*ee also United States v. Rodriguez*, 60 M.J. 239, 247 (C.A.A.F. 2004) (stating that an arrest must be supported by probable cause and distinguishing between the probable cause necessary for arrest and the reasonable suspicion necessary to conduct an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968)).

This Court reviews a military judge's denial of a motion to suppress for an abuse of discretion. *United States v. Nieto*, 76 M.J. 101, 105 (C.A.A.F. 2017). "An abuse of discretion occurs when we determine that the military judge's findings of fact are clearly erroneous or that he misapprehended the law." *United States v. Clayton*, 68 M.J. 419, 423 (C.A.A.F. 2010). "We review the legal question of sufficiency for finding probable cause de novo using a totality of the circumstances test," and "consider the evidence in the light most favorable to the prevailing party." *Leedy*, 65 M.J. at 212–13 (internal quotation marks omitted) (citations omitted).

We accept the lower court's conclusion that the military judge clearly erred in finding that Appellant had previously lived at the address on the package. The lower court then analyzed whether probable cause still existed absent the

erroneous fact considered by the military judge. As with an affidavit, in this situation: "[W]hen there are misstatements or improperly obtained information, we sever [that information] and examine the remainder to determine if probable cause still exists." *United States v. Gallo*, 55 M.J. 418, 421 (C.A.A.F. 2001). The lower court relied upon the following facts, as stated in its opinion: (1) that Customs and Border Control agents seized a package mailed from China containing more than two pounds of dimethylone, a Schedule I controlled substance analogue; (2) that the package was addressed to "Brandon Darnall" at a rental property near MCAGCC, Twentynine Palms; (3) that there were only three "Brandon Darnalls" located in the entirety of San Bernardino County, California; (4) that Appellant was the only "Brandon Darnall" of the three who was a servicemember; and (5) that Appellant was stationed aboard MCAGCC, Twentynine Palms.

Unlike the lower court, we do not conclude that the facts listed above provide sufficient evidence to establish probable cause to apprehend. Agent Pledger had uncovered nothing aside from a name connecting Appellant to the incriminating box. It appeared to have been mailed from an unidentified sender in China and Appellant was asked to pick it up—he did not volunteer, nor was it delivered to the address on the box. There was simply no connection between Appellant and the box apparent to Agent Pledger at the time of the arrest except that his name was printed on the outside and it was mailed to an address in the community surrounding the Marine base. The artificial setup orchestrated by Agent Pledger—having a fake package delivered to the unit mailroom and then telephoning Appellant to have him come pick it up—bears little resemblance to a "controlled delivery" situation in which law enforcement officials allow the shipment of a contraband substance to continue on its way to the intended recipient in order to confirm a suspect's involvement in the transport. As described by the Supreme Court in *Illinois v. Andreas*, in a controlled delivery:

> [T]he police, rather than simply seizing the contraband and destroying it, make a so-called controlled delivery of the container to its consignee, *allowing the container to continue its journey to the destination contemplated by the parties*. The person dealing in the contraband can then be identified

upon taking possession of and asserting dominion
over the container.

463 U.S. 765, 769 (1983) (emphasis added). Here, the container did not continue on its journey to the Twentynine Palms address on the package but was rather rerouted to the mailroom to which Appellant was summoned to retrieve it. The fact that he did so would not in any way confirm Appellant's involvement to a degree significant enough to establish probable cause.

"Evidence derivative of an unlawful search, seizure, or interrogation is commonly referred to as the 'fruit of the poisonous tree' and is generally not admissible at trial." *United States v. Conklin*, 63 M.J. 333, 334 (C.A.A.F. 2006) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Here, the statements Appellant made in that initial interview provided the basis for the search of his phone, which in turn supplied the photos and text messages that formed the basis for subsequent charges. Appellant's first interview also led directly to his return to the CID building the following day where he then took part in a second, recorded interview with Agent Pledger, who was still in possession of and had at that point searched Appellant's phone.

We do not find any intervening factors sufficient to attenuate the taint of the illegal apprehension on the evidence derived from the phone or from the first or second interviews. The Supreme Court has stated that, in testing for causal connection between an illegal arrest and a subsequent confession, factors that should be considered include "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, … and, particularly, the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975) (footnote omitted) (citations omitted). Here, the initial interview took place directly following the arrest, with no intervening circumstances except the drive to the CID building and Appellant being advised of his rights.[5] Though

---

[5] In *Brown*, the Supreme Court found that the warnings in accordance with *Miranda v. Arizona,* 384 U.S. 436 (1966), by themselves did not automatically purge the taint of an illegal arrest, stating that "[i]f *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest,

Appellant did leave the building overnight between the first and second interviews, the fact that Agent Pledger told him to return and that the agent still possessed Appellant's phone indicate the second interview is best characterized as an extension of the first rather than a fresh start.

This brings us to the third factor, the purpose and flagrancy of the official conduct. The record does not reveal any malignant intent behind Agent Pledger's actions. However, we do not think it necessary that the agent's misconduct be outrageous for the third factor in *Brown* to apply. Though there is no evidence of bad motive or intent on the investigator's behalf, we do believe that his actions were "unwise, avoidable, and unlawful." *Conklin,* 63 M.J. at 339. By all appearances, Agent Pledger conducted a hasty and flimsy initial investigation before apprehending Appellant. He did not seek out and speak to the previous owner of the house to which the package was addressed, attempt to speak to Appellant at all prior to his detention, or even call the telephone number listed on the package. He did not ask Customs and Border Protection for help in running the names and addresses involved through their own records, which would have, and later did, turn up the October 2011 box that had been destroyed. In Agent Pledger's own words, if Appellant had given no indication during that initial interview that he was the intended recipient of the package, the "investigation probably would have sunk at that time and not been continued." In *Conklin*, after executing an illegal search and finding contraband on the appellant's computer, officers alerted law enforcement agents, who obtained consent from the appellant to search his room and computer. This Court, finding the officers' actions were "unnecessary and unwise," determined that the taint of the unlawful search was not attenuated by obtaining subsequent consent to search. *Conklin* at 63 M.J. at 339–40. As in *Conklin*, the law enforcement actions in the instant case infringed inexcusably upon Appellant's Fourth Amendment rights and Agent Pledger openly "exploited the original illegality," using information obtained from Appellant in his post-apprehension interview to obtain a warrant for his phone. *Id*. at 339.

---

regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted." 422 U.S. at 602.

The Government argues that even if probable cause to apprehend did not exist, the exclusionary rule should not apply in the circumstances of this case. It cites the Supreme Court's statement in *United States v. Leon* that the exclusionary rule "operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." 468 U.S. 897, 906 (1984) (internal quotation marks omitted) (citation omitted). The exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Id.* at 919. However, we do not view Agent Pledger's behavior as objectively reasonable law enforcement activity. In *Brown,* the Supreme Court reminded us that the exclusionary rule "is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." 422 U.S. at 599–600 (internal quotation marks omitted) (quoting *Elkins v. United States,* 364 U.S. 206, 217 (1960)). The somewhat sloppy and apathetic investigation conducted by Agent Pledger prior to apprehending Appellant, in clear violation of his Fourth Amendment rights, is one type of law enforcement activity we would certainly hope to deter. Were we to determine that the exclusionary rule did not apply under such circumstances, excusing Agent Pledger's actions because they were not sufficiently flagrant or purposeful, we "might well be encouraging unlawful conduct rather than deterring it." *Conklin,* 63 M.J. at 340.

The Government also suggests that both the inevitable discovery and the good faith exceptions to the exclusionary rule should apply here. We disagree. The inevitable discovery doctrine is contained in M.R.E. 311(b)(2), which states that: "Evidence that was obtained as a result of an unlawful search or seizure may be used when the evidence would have been obtained even if such unlawful search or seizure had not been made." To take advantage of this doctrine, the prosecution must establish, by a preponderance of the evidence, that: "*when the illegality occurred,* the government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence and that the evidence would inevitably have been discovered in a lawful manner had not the illegality occurred." *United States v. Hoffmann*, 75 M.J.

120, 125 (C.A.A.F. 2016) (internal quotation marks omitted) (citations omitted). Though there was further evidence against Appellant that may have arisen in the course of the investigation independent of his admissions to Agent Pledger (the renter of the house's statement that Appellant asked to have packages delivered to him, the previous package destroyed by Customs and Border Protection), we are not convinced that, when CID arrested Appellant, they were actively pursuing this evidence. We also note Agent Pledger's testimony that if Appellant had not suggested during that initial interview that he was the intended recipient of the package, the "investigation probably would have sunk at that time and not been continued."

"The 'good faith' exception to the exclusionary rule [applies] in cases where the official executing the warrant relied on the magistrate's probable cause determination and the technical sufficiency of the warrant, and that reliance was 'objectively reasonable.'" *United States v. Carter*, 54 M.J. 414, 419 (C.A.A.F. 2001) (citing *Leon*, 468 U.S. at 922). Here, we determine that the Government has not met its burden of establishing the good faith doctrine. *See Nieto*, 76 M.J. at 108.

We therefore conclude that Agent Pledger did not have probable cause to apprehend Appellant and that any evidence derived from the fruits of that apprehension should be suppressed.

## Decision

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be authorized.