*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
TANG, LAWRENCE, and STEPHENS,
Appellate Military Judges

_____

**UNITED STATES**
Appellant

**v.**

**Jerry R. WHITE**
Aviation Electrician's Mate First Class (E-6), U.S. Navy
Appellee

**No. 201900221**

Decided: 11 March 2020.

Appeal by the United States Pursuant to Article 62, UCMJ. Military Judge: Jonathan T. Stephens, JAGC, USN (arraignment); Aaron C. Rugh, JAGC, USN (motions). Arraignment: 9 May 2019 by a general court-martial convened at Naval Base San Diego, California.

For Appellant: Lieutenant Joshua C. Fiveson, JAGC, USN; Captain Brian L. Farrell, USMC.

For Appellee: Captain Mary Claire Finnen, USMC.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

STEPHENS, Judge:

This is a Government interlocutory appeal[1] from a military judge's ruling suppressing evidence of child pornography found on Appellee's computers. When the Department of Homeland Security (DHS) investigated sexual exploitation of children in the Philippines, Aviation Electrician's Mate First Class (AE1) Jerry White's name turned up. The connection, though somewhat tenuous, was enough for Naval Criminal Investigative Service (NCIS) Special Agent (SA) Mark Garhart to obtain a search authorization for AE1 White's home and any electronics in it. When NCIS agents searched his off-base home near Naval Air Facility Atsugi, Japan, they seized nine computer hard drives; three of them contained suspected child pornography. As a result, the Government preferred charges alleging violations of Article 134, Uniform Code of Military Justice (UCMJ), for possession of child pornography on three separate devices, and referred the charges to a general court-martial. The military judge suppressed the evidence because the search authorization lacked probable cause. We agree that it lacked probable cause, but the salient question before us is whether SA Garhart acted in good faith in seeking and executing the search authorization. We find it was reasonable for SA Garhart to believe the commanding officer who authorized the search had a substantial basis to determine probable cause existed. Accordingly, we apply the good faith exception to vacate the military judge's ruling that suppressed the fruits of the search and remand.

## I. BACKGROUND

### A. The Department of Homeland Security Investigation

Christopher Villanueva raped young girls for the enjoyment of a paying live-stream Internet audience. He operated out of Taguig City in Manila, an area known for child sexual exploitation, and collected payment through wire transfers. An undercover Homeland Security Investigations (HSI) agent attempted to purchase a pornographic child-rape show from Villanueva, who directed the agent to send payment to an account in the name of Jusan Noriega. It was unknown whether Noriega was an associate of Villanueva or an alias.[2] HSI agents suspected AE1 White may have been one of Villanue-

---

[1] 10 U.S.C. § 862 (2016).

[2] The HSI report indicated Noriega was an associate of Villanueva and never referred to him as an alias. In his affidavit, SA Garhart referred to Noriega as an "alias" for Villanueva, a contention that appears to be adopted by both trial defense counsel and trial counsel. *See* App. Ex. IV (Defense Motion to Suppress) at 1; App.

va's customers because a Xoom wire transfer account under the name "Jared White"[3] was used to attempt to wire Noriega exactly ten dollars in May of 2015. Less than four weeks after this attempted transfer, the Philippine government arrested Villanueva. With "Jared White's" money unclaimed, the wire-transfer company returned it to the sending account.

After AE1 White became a suspect in the investigation, HSI obtained records showing the history of his other suspected wire transfers using the name "Jared White." They located a MoneyGram account belonging to "Jared White," listing the same Norfolk address used for the Xoom account. Between May 2012 and December 2014, the "Jared White" MoneyGram account was used to make 167 wire transfers—nearly all to the Philippines—totaling almost 5,000 dollars. The payments were all between 10 and 180 dollars, with the majority under 50 dollars. None of the recipients' identities were known, but 60 percent of them were in Taguig City. From May 2015 to May 2016, "Jared White" made another 22 wire transfers, using Xoom, totaling over 700 dollars to 11 different people.[4] One of the transfers was the 10 dollars transferred to Jusan Noriega.

An e-mail and a physical address were associated with the Xoom account. The e-mail matched the one HSI had in its intelligence file for AE1 White, and the physical address was the address of his Norfolk command. The Xoom records also showed "Jared White" used 19 different Internet protocol (IP) addresses to wire money between May 2015 and May 2016. All the IP addresses were registered to KDDI, a Japanese Internet service provider. AE1 White left Norfolk for assignment to Naval Air Station Atsugi, Japan, in October 2015. In February 2017, DHS transferred the case to NCIS.

---

Ex. V (Government Response to Defense Motion to Suppress) at 1; and Record at 41-42. The military judge made a Finding of Fact that it "may" have been an alias, noting the DHS report indicated Noriega was an associate. Whether Noriega was a separate person or an alias for Villanueva himself is not relevant to our analysis.

[3] The account was registered to "Jared White," using an e-mail address of "jared[ ]@[ ].com" and listed an address belonging to AE1 White's prior squadron in Norfolk, VA. The HSI report indicates that agents were also able to link the "jared[ ]@[ ].com" e-mail address with AE1 White but did not indicate how.

[4] The HSI report states AE1 White made wire transfers to "Jusan Noriega and the (10) other recipients in the Philippines." *See* App. Ex. IV (Defense Motion to Suppress), Enclosure (A) (DHS Report) at 4.

**B. The Command Authorized Search and Seizure**

After he received the HSI investigation, SA Garhart reviewed AE1 White's military records, but found nothing of evidentiary value, though he was able to confirm his off-base residence. With the above information, SA Garhart—who then had about 15 years of experience, including three years at Naval Air Station Atsugi, and more than 50 child pornography cases under his belt—drafted an affidavit and a search authorization for the commanding officer's (CO) signature.[5] He forwarded the documents to the CO and his staff judge advocate (SJA) for legal review.[6]

Just as he had done many times in the past, as it was his usual course of business, SA Garhart followed up by meeting with the CO. He personally briefed the CO and answered his questions. In his affidavit, SA Garhart included a "typology" section stating that, based on his experience, collectors of child pornography rarely permanently disposed of their images or videos. The CO signed the search authorization allowing SA Garhart to search AE1 White's off-base home for electronic media storage devices that could contain child pornography. Three of the nine hard drives that were seized contained such contraband. NCIS also found software for recording live-streamed videos.

**C. The Military Judge Suppressed the Evidence**

The Government charged AE1 White with possessing child pornography in violation of Article 134, UCMJ.[7] The Defense moved to suppress the suspected child pornography found on AE1 White's hard drives. In his written ruling granting the motion, the military judge held the search authorization lacked probable cause due to its lack of "connective tissue" between Villanueva and AE1 White. He wrote that SA Garhart's foundation for probable cause rested on "only three assertions": (1) that AE1 White made almost 200 wire transfers to unknown persons in the Philippines, including Taguig City, for more than 5,000 dollars, (2) that Taguig City is widely known as a hub for child exploitation and child sex trafficking, and (3) that in May 2015, AE1 White attempted to wire transfer 10 dollars to Villanue-

---

[5] Record at 39. Because the off-base rental property was managed by Naval Air Station Atsugi, the commanding officer had authority to sign a CASS for an off-base residence.

[6] *Id*. at 21.

[7] 10 U.S.C. § 934 (2012).

va/Noriega.[8] The military judge concluded the Government had not established whether AE1 White ever received any child pornography from Villanueva or anyone else in the Philippines, what types of electronic devices he possessed, or even whether he had Internet service in his home.

The military judge also briefly discussed, and dismissed, the possibility of the Government availing itself of the good faith exception. He concluded SA Garhart did not act with "malice" but, relying on *United States v. Carter*,[9] found the information he provided the CO was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[10] The military judge also wrote, "While agents operating in good faith may not always discern the legal threshold for probable cause with the same authority as the courts, still warrants and authorization must be rooted in *some* evidence from which a critical eye might perceive probable cause exists."[11]

## II. DISCUSSION

### A. Standard of Review

Whether under the normal course of appeal or an interlocutory appeal, we review a military judge's decision to admit or exclude evidence for an abuse of discretion.[12] "In reviewing a military judge's ruling on a motion to suppress, we review factfinding under the clearly-erroneous standard and conclusions of law under the de novo standard."[13] Because we do not find the military judge abused his discretion in finding the search authorization lacked probable cause, we focus our discussion on the application of the good faith exception found in Military Rule of Evidence 311(c)(3).[14]

---

[8] App. Ex. VIII at 6.

[9] 54 M.J. 414, 419-20 (C.A.A.F. 2001).

[10] App. Ex. VIII at 3 (quoting *Carter*, 54 M.J. at 419).

[11] *Id.* at 9 (emphasis in the original).

[12] *United States v. Wuterich*, 67 M.J. 63, 77 (C.A.A.F. 2008) (applying abuse of discretion standard in Article 62, UCMJ, appeal from evidentiary ruling).

[13] *United States v. Henning*, 75 M.J. 187 (C.A.A.F. 2016) (quoting *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)).

[14] *See United States v. Perkins*, 78 M.J. 381, 386-87 (C.A.A.F. 2017) (citing *United States v. Lopez*, 35 M.J. 39 (C.M.A. 1992)) (finding that a court need not determine sufficient probable cause if concluding good faith exception applies).

## B. Good Faith Exception

### 1. The establishment of the good faith exception

Ratified in 1791, the Fourth Amendment states in part, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[15] Over a century later in *Weeks v. United States*,[16] the Supreme Court, desiring to deter abuses of power by Federal law enforcement, created the exclusionary rule. Evidence seized in violation of the Fourth Amendment was to be suppressed. The exclusionary rule was not "incorporated" against the States until 1961 in *Mapp v. Ohio*.[17] The rule was now "brought to bear in favor of accused murderers and armed robbers . . . which had previously largely had an application to bootleggers and purveyors of stolen lottery tickets."[18] After two decades of concern over the "substantial social costs" of the exclusionary rule, the Court created the good faith exception in *United States v. Leon*.[19]

The exclusionary rule was always aimed squarely at the objectively unreasonable actions of law enforcement and not neutral judicial officers and magistrates with no "stake in the outcome."[20] A magistrate's imprimatur upon a search warrant was thought to curb law enforcement's excesses. The Court's new good faith exception permitted the use of evidence "when an officer acting with objective good faith obtained a search warrant from a judge or magistrate and acted within its scope" because "[i]n most such cases, there is no police illegality and thus nothing to deter."[21]

---

[15] U.S. CONST. amend IV.

[16] 232 U.S. 383 (1914).

[17] 367 U.S. 643 (1961). The Court incorporated the Fourth Amendment against the States in *Wolf v. Colorado*, 338 U.S. 25 (1949), but declined to incorporate the exclusionary rule as it was not a necessary feature of the Fourth Amendment.

[18] *California v. Minajeres*, 443 U.S. 916, 927 (1979) (Rehnquist, J., dissenting).

[19] 468 U.S. 897 (1984).

[20] *Id*. at 917.

[21] *Id*. at 920-21.

Two years after *Leon*, the President promulgated the military good faith exception in Military Rule of Evidence 311.[22] The Rule (paraphrased) allows evidence obtained from an unlawful search or seizure to be used if:

> (A) the search authorization came from a military or civilian official competent to issue such authorizations,
>
> (B) the official had a substantial basis for determining the existence of probable cause, and
>
> (C) the individuals seeking and executing the search relied with objective good faith on the issuance of the search authorization.[23]

The language in prong (B) of the Rule is very similar to the term "substantial basis" as used in the Supreme Court's probable cause definition from *Illinois v. Gates*.[24] If read literally, it would mean any time a reviewing court held a search authorization lacked probable cause, that the second prong of the Rule could not apply. So, our superior court later interpreted prong (B) to read as "the law enforcement official had an objectively reasonable belief that the magistrate had a 'substantial basis' for determining the existence of probable cause."[25] With AE1 White conceding prong (A), and no reason to doubt prong (C),[26] we focus exclusively on prong (B).

### 2. The application of the good faith exception

The good faith exception applies when law enforcement agents "act with an objectively 'reasonable good-faith belief' that their conduct is lawful."[27] In applying prong (B) of the good faith exception, we focus on the information law enforcement possessed at the time of seeking a search authorization.

---

[22] Initially promulgated as Military Rule of Evidence 311(b)(3), Manual for Courts-Martial, United States (1984 ed.).

[23] Mil. R. Evid. 311(c)(3), Manual for Courts-Martial, United States (2019 ed.).

[24] 462 U.S. 213 (1983).

[25] *United States v. Carter*, 54 M.J. 414, 422 (C.A.A.F. 2001).

[26] Here, as in *United States v. Perkins*, 78 M.J. 381, 398 (C.A.A.F. 2019), we find neither that the CO "rubber-stamped" the search authorization, nor that there was a "facially defective" search authorization "because it identified the place to search (Appellant's home) and described in detail what to look for ('all electronic devices and media storage containers . . . ')."

[27] *Davis v. United States*, 564 U.S. 229, 238 (2011) (citing *Leon*, 468 U.S. at 922 n.23).

Here, SA Garhart unquestionably had a lot of "smoke." It is also true had he taken more investigatory steps, he could have easily obtained additional information amounting to probable cause, such as verifying that the e-mail address from the wire-transfers matched a civilian e-mail listed in AE1 White's military records, verifying if AE1 White had any devices registered with the Japanese Internet service provider or that he had this particular Internet service in his home, or even questioning AE1 White directly. But with the information he did have, the question is whether SA Garhart had an "objectively reasonable" belief the CO had a "substantial basis" to determine probable cause.

Drawing on the DHS investigation, SA Garhart knew the following:

> Between May 2012 and May 2016, accounts connected to AE1 White—registered in a name similar to his, using an e-mail address linked to AE1 White, and using the physical address of AE1 White's prior command—made 189 wire transfers using two different companies;

> The wire transfers totaled $5,440.67;

> Of the 167 wire transfers between May 2012 and December 2014, 157 listed addresses, 102 of which were in "Taguig City";

> Taguig City, a self-contained city in Manila, in the Philippines, is known for its "widespread child exploitation," the "pervasive" "sex trafficking of children," and is a "destination for child sex tourists;"

> The 2012 to 2014 wire transfers were all between 10 and 180 dollars, with the majority being less than 50 dollars;

> The 22 wire transfers between May 2015 and May 2016 were all to the Philippines;

> The 2015 to 2016 wire transfers used IP addresses registered to KDDI, a Japanese Internet service provider;

> AE1 White lived off-base near Naval Air Station Atsugi, Japan, and had an e-mail address;

> The 2015 to 2016 wire transfers were to 11 different recipients;

> Though the wire transfer was never completed, one of the 2015 to 2016 recipients was to a name associated with Christopher Villanueva for exactly 10 dollars;

> Christopher Villanueva was known to live-stream broadcast his rapes of young girls in Taguig City for a paying Internet audience.

With this information at SA Garhart's disposal, he drafted and signed a sworn affidavit, drafted a search authorization for his supervisor to review, submitted them to the CO and his SJA for review, and scheduled a meeting to discuss the search authorization where he answered questions. According to SA Garhart, the CO "and his legal counsel reviewed" the documents.[28] Ultimately, we agree with the military judge that despite SA Garhart's efforts, the information he provided to the CO and his legal advisor falls short of establishing probable cause for issuance of the search authorization. We must therefore decide whether SA Garhart's actions were "simple, isolated negligence" or if his actions descended to "deliberate, reckless, or grossly negligent disregard of Fourth Amendment rights."[29]

A few cases in which the Court of Appeals for the Armed Forces (CAAF) considered searches and seizures or the good faith exception are instructive. In *United States v. Hoffmann*,[30] an NCIS special agent investigated a corporal allegedly driving around base soliciting young boys for sex. The NCIS special agent obtained a search authorization to look for child pornography on his computer. This was based solely on the allegations and her "training and experience" of an "intuitive relationship" between child molestation and possession of child pornography. Because this search authorization had no "substantial basis for determining the existence of probable cause," CAAF declined to apply the good faith exception. Although later, in *United States v. Perkins*,[31] CAAF noted certain deficiencies in its analysis in *Hoffmann,* we still find a factual comparison to be helpful.

In *United States v. Darnall*,[32] United States Customs agents intercepted a package from China containing chemicals used for manufacturing drugs. It was addressed to a "Brandon Darnall" living near the Marine Corps base at Twentynine Palms, California. When a Marine Criminal Investigative Division (CID) agent went to the address on the package, he found only an empty house for rent. Public records showed three people in the surrounding county with the same name, including one Twentynine Palms Sailor. The CID agent decided to make a fake package resembling the package shipped

---

[28] Appellate Exhibit IV, "Defense Motion to Suppress Evidence Obtained From the Search of AE1 White's Home," Enclosure (D) "Special Agent Garhart Article 32 Testimony" at 27.

[29] *Id.* at 238.

[30] 75 M.J. 120 (C.A.A.F. 2016).

[31] 78 M.J. 381 (C.A.A.F. 2019).

[32] 76 M.J. 326 (C.A.A.F. 2017).

from China and have Darnall summoned to retrieve it from his unit's mailroom. When Darnall had no real reaction upon seeing the package, CID detained and questioned him. He admitted to purchasing drugs from China that he sold to local "smoke shops" before the drugs were added to the Drug Enforcement Agency's list of controlled substances. On this information, later held to be statements Darnall made after an illegal apprehension not supported by probable cause, CID obtained a search authorization for Darnall's cell phone. Largely because the CID agent's behavior was not "objectively" reasonable—in fact, CAAF called his investigation "sloppy and apathetic"—the good faith exception did not apply.[33]

The good faith exception also did not apply in *United States v. Nieto*.[34] When two Soldiers saw Nieto recording them in the toilet with his cellphone, they reported him. A non-commissioned officer looked through Nieto's cell phone but found no such pictures or videos. An Army CID special agent coupled this information with his "experience" that people transferred such videos from a phone to a computer, and obtained a search authorization for Nieto's laptop. The special agent's only basis for believing Nieto owned a laptop was that another special agent told him "somebody" had previously seen a laptop on Nieto's bunk.[35] Because there was an insufficient nexus between Nieto's cell phone and his laptop, there no probable cause and the good faith exception did not apply.

When we compare SA Garhart's actions with the actions of the NCIS special agent in *United States v. Perkins*—a case in which CAAF held the good faith exception did apply—as contrasted with the special agents in *Hoffmann*, *Darnall*, and *Nieto*, we find SA Garhart's actions justify application of the good faith exception. In *Perkins*, a civilian woman reported that a Marine threatened to extort her by publicizing videos of their past sexual intercourse. She did not have any information about any such videos, but offered that he once used his cell phone during sex. The command recalled Perkins from leave to issue him a Military Protective Order to avoid contact with the civilian woman. They expected him to arrive the next day. The NCIS special agent consulted with the SJA and two trial counsel before obtaining a verbal search authorization from the base CO to enter Perkins's home and search all electronic devices capable of storing videos and pictures. During her sweep, she saw what appeared to be stolen military property in plain

---

[33] *Id.* at 332.

[34] 76 M.J. 101 (C.A.A.F. 2017).

[35] *Id.* at 103, 105.

sight. She stopped and requested and received a search authorization for those items, too. Though her initial search lacked probable cause, CAAF applied the good faith exception primarily because she sought, received, and relied on legal advice.

While we conclude SA Garhart could have, and should have, done more investigating, he nevertheless did have a quantum of information sufficient to believe the CO would not hesitate to sign the search authorization. He also specifically provided this information to the CO and his SJA to seek legal advice prior to obtaining the CASS. Based on the information he had and the actions he took, SA Garhart had a substantial basis to believe the CASS he executed had been lawfully obtained. For these reasons, we find his actions were not of the type targeted by the exclusionary rule and hold that the Government may rely on the good faith exception to use the seized evidence at trial.

## III. CONCLUSION

The appeal of the United States is **GRANTED**. The military judge's ruling in Appellate Exhibit VIII is **VACATED** and the record of trial is returned to the Judge Advocate General for remand to the convening authority and delivery to the military judge for further proceedings.

Senior Judge TANG and Judge LAWRENCE Concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court