UNITED STATES, Appellee,

v.

Robert L. DAVIS, Operations Specialist Seaman Apprentice, U.S. Navy, Appellant.

No. 67,458.
NMCM 89 2569.

U.S. Court of Military Appeals.

Argued Nov. 3, 1992.

Decided March 11, 1993.

For Appellant: *Lieutenant Mary Anne Razim–Fitzsimmons,* JAGC, USNR (argued); *Lieutenant Franklin J. Foil,* JAGC, USNR.

For Appellee: *Captain Brett D. Barkey,* USMCR (argued); *Colonel T.G. Hess,* USMC and *Lieutenant Ralph G. Stiehm,* JAGC, USNR (on brief); *Commander W.F. Shields,* JAGC, USN.

**338**

GIERKE, Judge:

A general court-martial composed of officer members convicted appellant of unpremeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. His approved sentence provides for a dishonorable discharge, confinement for life, total forfeitures, and reduction to E–1. The Court of Military Review affirmed the findings and sentence in an unpublished opinion dated September 16, 1991.

This Court granted review of the following issues:

I

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED IN AFFIRMING THE TRIAL JUDGE'S DENIAL OF APPELLANT'S MOTION TO SUPPRESS BOTH HIS POOL CUES, AND ALL STATEMENTS MADE TO NAVAL INVESTIGATIVE SERVICE AGENTS ON 20 OCTOBER 1988, AS PRODUCTS OF AN UNWARNED INTERROGATION IN VIOLATION OF HIS ARTICLE 31(b) RIGHTS.

II

WHETHER THE TRIAL JUDGE ERRED BY FAILING TO SUPPRESS APPELLANT'S STATEMENTS TO NIS AGENTS DURING THE 4 NOVEMBER CUSTODIAL INTERROGATION.

*Factual Background*

Seaman Apprentice Keith Shackleton was found dead behind the commissary at Charleston Naval Base at approximately 5:30 a.m. on October 3, 1988. Shackleton was last seen alive playing pool at the Charleston Naval Base Enlisted Mens' Club on the evening of October 2. He died of head injuries inflicted with a blunt object. During the ensuing investigation Naval Investigative Service (NIS) agents interviewed "maybe a hundred to two hundred and fifty people." The interview notes of NIS Special Agent (SA) Baldwin indicate that appellant was one of several persons interviewed at the Enlisted Mens' Club on the evening of October 14, 1988, but the contents of that interview were not established on the record.

On October 17, SA Sentell, the lead agent in the investigation, was informed by a pathologist that "the injuries look to be consistent with a long tubular shock-absorbing object." The pathologist told SA Sentell that "a pool cue, butt end of a pool cue stick could have been used."

On October 18, SA Sentell interviewed two sailors, who told her that appellant was at the club on the night of October 2 until near closing time. The NIS agents also learned, from sources not mentioned in testimony, that only personally owned pool cues were allowed to be removed from the Enlisted Mens' Club. The NIS then began trying to determine which patrons of the Enlisted Mens' Club owned their own pool cues.

On October 19, NIS agents Sentell and Clark went aboard appellant's ship to interview him, but he was absent without authority. On October 20, they determined that appellant was present for duty and returned to his ship to interview him. They informed appellant's command that appellant was "a possible witness."

Before they interviewed appellant on October 20, SA Clark and SA Sentell were informed by the ship's executive officer that appellant was being referred to medical authorities for a mental status evaluation. SA Clark testified that he was informed that appellant "had made a statement regarding wanting to shoot somebody." SA Clark concluded that appellant "was prone to making statements of that nature," but he did not regard the information as pertinent because "we were not looking at a victim of a shooting." SA Sentell testified that she was informed that appellant had said "he might need to kill a cop" and that the command was concerned about appellant's "mental stability."

Prior to interviewing appellant, SA Clark interviewed Petty Officer Guidry. Guidry had heard appellant say that he heard (from another person) that Shackleton had been "hit and jabbed with a pool stick." The cause of Shackleton's death was not common knowledge, and SA Clark regarded this information "as intimate information regarding the manner of death."

When he was interviewed by the NIS on October 20, appellant was restricted to his ship because of prior misconduct unrelated to the murder of Shackleton. Appellant was escorted to the interview room aboard ship by Petty Officer Smith, a master-at-arms. Smith told the NIS agents that appellant had told him (Smith) "that he didn't kill [Shackleton], but he knew who did and he wasn't going to tell unless it looks like he was going to get blamed for the death."

Appellant was not advised of his Article 31(b)* rights prior to being interviewed by SA Clark and SA Sentell, because they did not consider him a suspect. Appellant was shown a photograph of Shackleton and said that he recognized him because he had "shot pool with him." Appellant confirmed that he was at the club on the evening of October 2. Regarding Shackleton's death, appellant "said that he had heard that the guy was beaten with a pool stick from Bonnie and Wade—Bonnie Krusen and Wade Bielby." Appellant told the NIS agents that he owned two pool cues. SA Sentell described appellant's attitude during the interview as "[v]ery cooperative." The entire interview lasted about 30 minutes.

Appellant led the NIS agents to his girlfriend's house, where he removed a case containing two pool cues from his girlfriend's automobile and gave them to SA Clark. This agent told appellant that he would like to examine the pool cues, at which time appellant pointed out a spot on

the pool cue case. Appellant first said that the spot was catsup, but then he said it might be his own blood.

Appellant's service records were obtained by the NIS agents on October 25. Those records reflect that appellant was absent from his duty station on the morning of October 3, the day that Shackleton's body was found, but both SA Clark and SA Sentell testified that they did not review appellant's service records until after October 20 and that they were unaware of his unauthorized absence on October 3 when they interviewed him on October 20.

Appellant was neither the first nor the last witness interviewed, nor was he the first or last who was asked to produce his pool cue for examination. SA Clark testified that one other pool cue had been "collected" from "Kaiser" and examined prior to the interview with appellant. Bonnie Krusen and Wade Bielby, who had been interviewed prior to appellant, were interviewed again after appellant mentioned them, along with "a lot" of other witnesses. The NIS also obtained pool cues from Bonnie Krusen and Wade Bielby.

On November 1, SA Clark interviewed Petty Officer Mull, who informed SA Clark that appellant had admitted killing Shackleton. At that point the NIS agents regarded appellant as a suspect.

On November 4, 1988, appellant was escorted to the NIS office to be interviewed. SA Sentell advised him of his Article 31(b) rights and his right to counsel. Appellant executed a written waiver of his rights. SA Sentell orally asked appellant "if he would answer some questions" and appellant responded that he would "because he didn't kill anyone." The interview began at about 4:30 p.m.

SA Sentell testified that at approximately 5:53 p.m., appellant said, "Maybe I

* Article 31, Uniform Code of Military Justice, 10 USC § 831, provides in pertinent part as follows:

(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

should talk to a lawyer." She then stopped questioning appellant about the offense. When asked if she did anything to clarify appellant's comment, she testified:

[We] made it very clear that we're not here to violate his rights, that if he wants a lawyer, then we will stop any kind of questioning with him, that we weren't going to pursue the matter unless we have it clarified is he asking for a lawyer or is he just making a comment about a lawyer, and he said, "No, I'm not asking for a lawyer," and then he continued on, and said, "No, I don't want a lawyer," and then he said he didn't kill the guy and he said that he was the type of person that if he did kill the guy, he'd have to tell someone about it."

Q. So, as you were clarifying whether or not he wanted a lawyer, the accused specifically said that he did not, correct?

A. Correct.

Q. And then he went on and he initiated further conversation beyond that?

A. Yes, he did.

The NIS agents took a short break after questioning appellant about his desire for counsel. Before resuming questioning, they briefly reminded appellant of his rights but did not repeat the advice in full or execute another written waiver. SA Sentell testified that, a short time later, at approximately 6:57 p.m., appellant said, "I think I want a lawyer before I say anything else." At that point questioning ceased. SA Sentell testified, "That was the end of the interview, and we called the ship."

Appellant described his comment about a lawyer during the November 4 interview as follows:

Well, they were talking to me, and I said, "Well, I'd like a lawyer," and they said, "We'll take a break," and they walked out and left me handcuffed to the chair, and an older guy came in and stood by the door watching me.

Appellant testified further that, after a short break, "They came back in and started questioning me again."

SA Clark testified that appellant orally denied killing Shackleton. Appellant initially said that his girlfriend was with him at the club, but when confronted with her denial that she was at the club on the night of October 2, appellant said that he was at the club "with three other friends."

The defense made timely motions to suppress the pool cues surrendered by appellant on October 20 and the results of the November 4 interrogation. The military judge denied both motions to suppress.

### The October 20 Interview

Appellant contends that the military judge erred by refusing to suppress the fruits of the October 20 interview, including appellant's production of the pool cues and his explanation for the spot on the pool cue case. Appellant argues that he was a suspect on October 20 and that failure to advise him of his rights as a suspect made the fruits of the interview inadmissible.

■ Whether a person being interviewed is a "suspect" is a question of law. *United States v. Good*, 32 MJ 105, 108 (CMA 1991). The military judge's factual determinations pertaining to what criminal investigators knew at the time of the interview will be upheld unless "clearly erroneous"; but the legal issue whether the person being interviewed was a suspect will be reviewed *de novo. Id.; United States v. Uribe-Velasco*, 930 F.2d 1029, 1032 (2d Cir. 1991). If a criminal "investigator suspects or reasonably should suspect" a person "of a crime, then rights' warnings are required." *United States v. Schake*, 30 MJ 314, 317 (CMA 1990).

■ We hold that appellant was not a suspect when he was interviewed on October 20. The NIS had determined that a pool cue was the probable murder weapon, but they were still trying to determine how many patrons of the Enlisted Mens' Club had privately owned pool cues. As of October 20, they had obtained one or two; appellant's was the second or third. They did not know how many they eventually would find. They ultimately found a total of

four. Appellant's "intimate information" about the murder was attributed to third parties. Appellant was a known disciplinary problem, but his bizarre comments about killing someone appeared to be directed at the police, not fellow pool players. Furthermore, appellant's comments concerned shooting someone, but the NIS was not investigating a shooting death. We agree with the military judge that, as of October 20, the investigation had not sufficiently narrowed to make appellant a suspect within the meaning of Article 31.

### The November 4 Interview

Appellant contends that the fruits of the November 4 interview should not have been admitted in evidence because they were obtained after he requested a lawyer. We hold that the limited results of the November 4 interview were properly admitted in evidence.

■ When an accused has invoked his right to have counsel present during a custodial interrogation, questioning must cease. *United States v. Applewhite*, 23 MJ 196, 198 (CMA 1987). The conflict between SA Sentell's description of what appellant said during his interrogation and appellant's description of what he said raised a question of fact which the military judge resolved against appellant. The military judge did not believe appellant's description of an unequivocal invocation of his right to counsel. Instead, he found that "the mention of a lawyer by the accused during the course of the interrogation to have been not in the form of a request for counsel and that the agents properly determined that the accused was not indicating a desire for or invoking his right to counsel."

■ The military judge's findings of fact should not be disturbed unless unsupported by the record or clearly erroneous. *United States v. Burris*, 21 MJ 140, 144 (CMA 1985), citing *United States v. Middleton*, 10 MJ 123, 133 (CMA 1981). In this case the military judge's rejection of appellant's assertion that he told the NIS, "I'd like a lawyer," is a finding of fact. The question

whether appellant's statement, "Maybe I should talk to a lawyer," invoked his right to counsel is a question of law. We hold that, because this comment by appellant did not unequivocally invoke his right to counsel, the NIS agents properly conducted further limited questioning to clarify appellant's ambiguous comment.

Some jurisdictions have held that any mention of counsel, however ambiguous, is sufficient to require that all questioning cease. Others have attempted to define a threshold standard of clarity for invoking the right to counsel and have held that comments falling short of the threshold do not invoke the right to counsel. Some jurisdictions, including several federal circuits, have held that "all interrogation" about the offense "must immediately cease" whenever a suspect mentions counsel, but they allow interrogators to ask "narrow questions designed to 'clarify' the earlier statement and the accused's desires respecting counsel." *See Smith v. Illinois*, 469 U.S. 91, 96 n. 3, 105 S.Ct. 490, 493 n. 3, 83 L.Ed.2d 488 (1984) (summarizing approach taken by various jurisdictions to ambiguous references to counsel). The Supreme Court has not yet resolved the issue. *Id.*

■ Not every vague reference to counsel requires termination of the interrogation. An ambiguous reference to counsel must, however, be clarified before interrogation may continue. *United States v. Mendoza–Cecelia*, 963 F.2d 1467, 1472 (11th Cir.1992); *United States v. Fouche*, 833 F.2d 1284, 1287 (9th Cir.1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988); *United States v. Cherry*, 733 F.2d 1124, 1130 (5th Cir.1984). *Cf. United States v. Sager*, 36 MJ 137, 145 (CMA 1992) (limited questioning permitted to clarify whether ambiguous conduct was intended to invoke right to silence). Further questioning is limited to clarifying the suspect's desires regarding counsel. The interrogator may not attempt to persuade the suspect that counsel is not necessary or desirable, or presume to tell the suspect

what counsel's advice is likely to be. *United States v. Cherry*, 733 F.2d at 1130.

■ In this case, appellant's comment, "Maybe I should talk to a lawyer," required clarification. *See United States v. Cherry*, 733 F.2d at 1130 ("Maybe I should talk to an attorney before I make a further statement."). SA Sentell immediately stopped questioning appellant about the murder and limited her questioning to appellant's comment about counsel. After appellant said, "No, I don't want a lawyer," the interrogators took a break, allowing appellant to consider his situation. After the break, they briefly reminded appellant of his rights before continuing the interrogation. *Cf. Maglio v. Jago*, 580 F.2d 202, 206 (6th Cir.1978) ("If the police had reexplained Maglio's rights and then withdrawn, allowing the boy to consider his alternatives, and he had then initiated further communication with the police, we would be able to find a waiver...."). Under the circumstances, we agree with the military judge's ruling that appellant did not invoke his right to counsel at this point in the interrogation.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and WISS concur.