*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
MONAHAN, STEPHENS, and LAWRENCE
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Bradley M. METZ**
Corporal (E-4), U.S. Marine Corps
Appellant

**No. 201900089**

Decided: 23 September 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
John L. Ferriter

Sentence adjudged 30 October 2018 by a general court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to E-1, forfeiture of all pay and allowances, confinement for one year, and a bad-conduct discharge.

For Appellant:
*Lieutenant Michael W. Wester, JAGC, USN*

For Appellee:
*Lieutenant Commander Timothy C. Ceder, JAGC, USN*
*Lieutenant Kimberly Rios, JAGC, USN*

Senior Judge STEPHENS delivered the opinion of the Court, in which Chief Judge MONAHAN and Judge LAWRENCE joined.

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————

STEPHENS, Senior Judge:

Appellant was convicted, contrary to his pleas, of one specification each of arson, housebreaking, and unlawful entry under Articles 126, 130, and 134,[1] respectively, of the Uniform Code of Military Justice [UCMJ].[2]

Appellant raises four assignments of error [AOEs]: (1) the military judge abused his discretion by finding Appellant was not a suspect when he was initially questioned by agents of the Naval Criminal Investigative Service [NCIS]; (2) Appellant's trial defense counsel [TDC] were ineffective by failing to move to suppress derivative evidence of an unlawful apprehension; (3) Appellant's TDC were ineffective by not learning of and moving to suppress Appellant's custodial statements;[3] and (4) the evidence is legally and factually insufficient.[4] We find no prejudicial error and affirm.

## I. BACKGROUND

### A. NCIS Investigates a Burned Building

On a Sunday morning before dawn, a fire broke out in a facilities maintenance building at Camp Pendleton. The base firefighters responded and put out the flames. They noted the flames emanated from inside the building and were started in five different places of one room. The most intense flames

---

[1] The military judge conditionally dismissed—to ripen into prejudice upon completion of appellate review—the Charge and its sole Specification under Article 134, UCMJ, as an unreasonable multiplication of charges with the Charge and sole Specification under Article 130, UCMJ.

[2] 10 U.S.C. §§ 926, 930, 934 (2012 & Supp. IV 2017).

[3] We have combined the second and third AOEs.

[4] We have considered the fourth AOE and find it to be without merit. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987), cert. denied, 485 U.S. 968 (1988). *See infra*, Part I (E) of the Opinion.

came from where some lawnmowers were set on fire. A pair of bolt cutters was found and some interior locks had been cut, but there were no signs of exterior forced entry. Suspecting arson, the firefighters alerted NCIS.

That morning at the crime scene, NCIS Special Agent [SA] Papa[5] interviewed the Staff NCO in charge of the maintenance building. The Staff NCO told him he had no "definitive list" of who had keys to the building, but that Appellant and one other Marine had keys. SA Papa noticed that a logbook and a hardhat with sergeant chevrons appeared to have been placed on top of a stack of lumber and burned. When he shared that information with the Staff NCO, the Staff NCO said the items belonged to a sergeant who had recently counseled Appellant. He called Appellant a "problem child."[6] SA Tango—who was also at the scene—made a written note next to Appellant's name, "[Staff NCO] said [Appellant] has bad grudge."[7] The notes indicate several people may have had keys or access to the building. SA Tango also wrote, "[S]ometimes the keys get passed to others."[8] The Staff NCO told the agents that Appellant and another Marine, both of whom had keys to the building, lived on the second deck at a nearby barracks. SA Papa and SA Tango then went to go speak with Appellant and the other Marine.

**B. A Screening Interview with Appellant**

When the agents got to the barracks, they came to Appellant's door first. It was propped open with the deadbolt, and they called out to see if anyone was there. A voice from inside said, "It's open."[9] SA Papa responded, "We prefer you come to the door."[10] After identifying themselves and Appellant having introduced himself, the agents told Appellant they were investigating an "incident at [his] workplace"[11] and asked if they could come inside to

---

[5] All names, other than those of the judges and counsel, are pseudonyms.

[6] R. at 46.

[7] App. Ex. XVII at 1. SA Tango's notes indicate as many as eight other people who may have had keys that evening.

[8] *Id.*

[9] R. at 48.

[10] *Id.*

[11] *Id.* at 49.

speak with him. Appellant said, "Yeah, no problem,"[12] and he opened the door. They did not provide him Article 31(b) warnings.

Once inside, the agents asked Appellant if he was aware of anything that occurred at his workplace earlier that morning. He said he was not. They asked him if he had keys to the maintenance building. He said he had loaned them to a friend and, implying they were lost, told the agents he filed a report about the keys. Noticing two made beds, SA Papa asked if Appellant had a roommate. He said he did not.

As Appellant was talking to SA Tango, SA Papa moved past the beds to the bathroom at the rear of the room. He did this to ensure no one else was present. This was part of his training and routine for officer safety. SA Papa testified that when Appellant invited them in, he "[g]ave the impression that he'd just woken up or [sic] in a recent bath."[13] SA Papa then noticed some shoes inside the bathroom that "appeared to be recently laundered or wet, as if they were drying."[14] They were hanging on towel hooks and the insoles were nearby, propped on the toilet paper holder.

SA Papa and Appellant had a brief exchange:

SA Papa: Hey are those Nikes?

Appellant: Yes.

SA Papa: Do you mind if I go and take a look at them?

Appellant: Yeah. That's no problem.[15]

According to SA Papa, when he got close to the shoes, he "started to detect an odor in the air of what I would normally associate with as gasoline; specifically, jet fuel or diesel."[16] As he got very close to the shoes, "it was an overwhelming odor."[17]

He then returned to the conversation and discreetly signaled to SA Tango that they should leave. The conversation ended with SA Papa asking Appellant to let them know if he had any information about the fire. The

---

[12] *Id.*

[13] *Id.* at 74.

[14] *Id.* at 75.

[15] *Id.* at 50. This is the conversation as recounted by SA Tango in her testimony.

[16] *Id.* at 75.

[17] *Id.*

reason SA Papa later gave for the abrupt end to the conversation was that he wanted to "regroup"[18] and consider what next steps to take based on the new information.

## C. Appellant is Detained Briefly and Then Consents to a Room Search

The agents went back down to their car and waited for about 20 minutes to try and observe Appellant, figuring he might attempt to dispose of the shoes in a dumpster. When they could not see him, they walked back up to his room. They noticed he had put the same wet shoes from before on a ledge near his door to dry. When Appellant did not answer the knock on his door, SA Papa went to look for him while SA Tango waited at the door. Appellant was down at the smoke pit. SA Papa called out to him and asked him to take his hands out of his pockets. When he was slow to comply, SA Papa handcuffed him and frisked him. SA Papa testified that he told Appellant, "Hey, you're making me real nervous right now, and we want to talk to you some more."[19] Though the record is unclear of exactly when this question was asked, SA Papa testified that he "asked [Appellant] if he'd be willing to come up and talk to us back at the room, at which time, we went back up to the room and he was released. I explained to him why I did that and we went from there."[20] SA Papa then brought Appellant, still handcuffed, back to his room where SA Tango was still waiting outside the door.

Once back at Appellant's room, SA Papa removed the handcuffs. At the time, the special agents did not believe they had probable cause for a search authorization, so SA Tango asked Appellant if they could search his room. He agreed. He read and signed a Permissive Authorization for Search and Seizure [PASS] form. The PASS indicated the subject of the investigation was "arson."

While in the room, the special agents did not ask Appellant any questions about the fire, but they did seize several items. Among them were the wet shoes and insoles that smelled of gasoline; a pair of black pants, a charcoal grey t-shirt, a white t-shirt, and a pair of boxer shorts, which were all inside a laundry bag; a blue lighter; and a silver key [that turned out not to be the

---

[18] *Id*. at 80.

[19] *Id*. at 77.

[20] *Id*.

facilities maintenance building key] found in Appellant's dresser drawer. The shoes and clothes were specially packaged for forensic testing.

The agents then drove Appellant to the NCIS office for an interview. Along the way, they discussed mostly food, but based on the later video of the interrogation it appears there was also some discussion about Appellant's dissatisfaction with the Marine Corps. When they arrived at the NCIS office, Appellant read and signed an Article 31(b) rights advisement warning.

During his interview, Appellant told the agents that on the night before the fire, he was drinking alcohol with a Marine friend and returned to his barracks room just after midnight. This friend, Corporal [Cpl] Tango, was a childhood friend from Appellant's hometown and had just returned from a deployment. Appellant then started doing laundry but fell asleep and did not wake up until 0900 or 1000. He first learned of the fire when he drove past the building on his way to the gym around 1100. He claimed his clothes smelled of gasoline because, three or four days prior, he had been working on his car.

The next day, Appellant signed another PASS to allow NCIS to conduct a second search of his barracks room. He was brought to NCIS for another interview and consented to NCIS obtaining his financial information. He requested to speak to a lawyer before he would consent to a search and seizure of his phone and smartwatch. They were eventually seized with a search authorization from the command.

During the second search of Appellant's barracks room, NCIS found a key hidden inside a tissue box. This key ultimately turned out to be a key to the facilities maintenance building. According to the Staff NCO, this was the key issued to Appellant, who had never reported anything along the lines of it being lost or missing. NCIS also seized a pair of black gloves in the back of Appellant's wall locker. The gloves smelled like fuel.

**D. Litigation Concerning the Investigation**

In pretrial motions, the Defense moved the military judge to suppress every statement made by Appellant and all the evidence seized by NCIS as derivative evidence. The Defense argued Appellant was a suspect when the special agents interrogated him at his barracks room and was therefore entitled to Article 31(b) warnings at that time. The Defense also argued that, because the special agents failed to administer the rights warnings, the interrogation was unlawful and that all of the Government's evidence in the case was derived from that interrogation and should be suppressed.

The military judge denied the Defense motion. In a written ruling he found the Government did not suspect, nor reasonably should have suspect-

ed, Appellant at the time of the initial interview. He also found that all of the evidence was independently discovered due to Appellant's consent to the first and second searches of his room and his consent to be interviewed by NCIS at the field office.

**E. Appellant is Found Guilty**

At trial, the Government presented a significant amount of evidence. The Government's fire experts testified that the fires were intentionally set and not the result of negligence or accident. The Defense expert admitted that his conclusions were consistent with those of the Government experts. The expert testimony also showed the fires were started with a combination of gasoline and biodiesel fuel. The same two fuels were found on Appellant's clothes, shoes, and gloves. When the items were seized, they were wet to the touch, appearing to have been recently washed. The biodiesel fuel on the clothes could not have come from Appellant working on his car (as he claimed during his NCIS interview), which had a layer of "road grime" on the undercarriage and had no signs of recent work or a fuel leak. Even at trial— some six months after the fire—the smell of fuel was on the items and members had the opportunity to smell them.

The evidence further showed that the fire alarm rang at 0335. Appellant's barracks room was only 0.35 miles away from the building. His key card showed an entry to his barracks room at 0336. The last key entry before that one was the evening before at 2014. Appellant's key to the building was never reported missing to anyone and was found hidden in a tissue box in his room during the second search. There were no signs of forced entry into the building, although there were signs of interior broken locks, and a pair of bolt cutters was found at the scene. The Government identified all other known key holders. All of them had alibis.

Appellant had been recently counseled by, among others, a sergeant at the unit. It was that sergeant's logbook and hardhat that were found on a stack of lumber where the fire appeared to have been the most intense.

The members heard testimony that Appellant lied to NCIS about his whereabouts that evening. He told the agents that he was with his friend, Cpl Tango, but came back to his room just after midnight and fell asleep, not leaving until he went to the gym around 1100. Cpl Tango testified for the Government, under a grant of immunity, that he twice lied to NCIS about Appellant's story, and did so at Appellant's behest. Cpl Tango testified that Appellant came to him late in the evening on the day of the early morning fire—after NCIS had already searched Appellant's room and interviewed him at the field office—and asked him to tell NCIS that the two of them were together at his hotel room the prior evening and were drinking a specific type

of alcohol. Cpl Tango testified that the truth was that he and his wife and their baby daughter had dinner with Appellant at a restaurant the night before the fire from around 1745 to 1900. During dinner, Appellant mentioned nothing about car problems.

The Defense introduced evidence of an on-base "Humvee" that caught fire and, in separate incidents, on-base dumpsters that caught fire while Appellant was in pretrial confinement. The Defense argued that another person intentionally set those other fires and could have also committed the charged arson of the facilities maintenance building. The Government argued the vehicle fire occurred because of an arced wire and there were no signs of foul play. The Government also argued that none of the dumpster fires was determined to be the result of arson. The Defense expert opined that the arced wire should have only caused the vehicle's circuit breaker to trip. He believed the Government should have classified the cause of the vehicle fire as "undetermined" rather than "accidental."

## II. DISCUSSION

### A. The Evidence Was Lawfully Seized

#### 1. Standard of review and the law

We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion.[21] "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion."[22] "When there is a motion to suppress a statement on the ground that rights warnings were not given, we review the military judge's findings of fact on a clearly-erroneous standard, and we review conclusions of law de novo."[23]

Article 31(b) warnings are required when: "(1) a person subject to the UCMJ, (2) interrogates or requests any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected."[24]

---

[21] *United States v. Ramos*, 76 M.J. 372, 375 (C.A.A.F. 2017) (citing *United States v. Alaya*, 43 M.J. 296, 298 (C.A.A.F. 1995)).

[22] *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000).

[23] *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000).

[24] *United States v. Jones*, 73 M.J. 357, 361 (C.A.A.F. 2014) (footnotes omitted).

Whether a person is "suspected of an offense" is a "question of law"[25] which is ascertained by considering "all the facts and circumstances at the time of the interview to determine whether the military questioner believed or reasonably should have believed that the servicemember committed an offense."[26] Though the standard of suspicion necessary to invoke the rights advisement requirement involves a "relatively low quantum of evidence,"[27] it must be based on more than "a hunch"[28] that the person committed the offense.

"A request for a consent to search does not infringe upon Article 31 or Fifth Amendment safeguards against self-incrimination because such requests are not interrogations and the consent given is ordinarily not a statement."[29]

*2. Appellant's legal theory of derivative evidence conflates Supreme Court precedent concerning the Fourth Amendment and the Fifth Amendment*

The Supreme Court first used the "fruit of the poisonous tree" doctrine in 1939 in *United States v. Nardone*.[30] A "causal connection" is not enough to mandate exclusion of evidence, because "as a matter of good sense . . . such connection may have become so attenuated as to dissipate the taint."[31] Later, in 1963, in *Wong Sun v. United States*, the Court expounded on the doctrine and rejected a simple "but for" test, stating that the "more apt question" is whether, "granting establishment of the primary illegality" the evidence was gained by "exploitation of that illegality or instead by means sufficiently distinguishable to be purged by the primary taint."[32]

We note at the outset that Appellant urges us to consider that his initial, unwarned statements to the NCIS special agents are the poisonous tree and—from that poisonous tree—the Government derived the evidence obtained from Appellant's first PASS—namely the shoes and his fuel-soaked

---

[25] *United States v. Davis*, 36 M.J. 337, 340 (C.M.A. 1993).

[26] *Swift*, 53 M.J. at 446 (citation omitted).

[27] *Id.* at 447.

[28] *Id.* (citing *United States v. Meeks*, 41 M.J. 150, 161 (C.M.A. 1994)).

[29] *United States v. Frazier*, 34 M.J. 135, 137 (C.M.A. 1992).

[30] 308 U.S. 338 (1939).

[31] *Id.* at 341.

[32] *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

clothes. "This is incorrect because *Miranda*,"[33] and Article 31(b), "'serves the Fifth Amendment,' not the Fourth Amendment."[34] "[T]he Fourth Amendment does not compel suppression of physical evidence obtained as a result of a statement taken in violation of *Miranda*."[35] The Supreme Court, in a plurality, has "specifically held that a *Miranda* violation does not implicate the 'fruits doctrine' of *Wong Sun* and its progeny."[36] The Court of Appeals for the Armed Forces [CAAF] has held that a violation of the *Edwards*[37] rule, which prohibits police from initiating questioning after a suspect's clear invocation of counsel, is "only one factor 'to be considered in determining whether . . . consent was voluntarily given, but it is not the decisive fact.'"[38] In other words, even if Appellant's unwarned initial statements were in violation of his Article 31(b) rights, and therefore was a poisonous tree, it does not necessarily follow that evidence obtained in a subsequent search and seizure is automatically poisonous fruit. We still look to the totality of the circumstances of Appellant's consent to the PASS, and consider any Article 31(b) violations as merely one factor.

### 3. Appellant was not yet a suspect during the initial encounter

#### a. Appellant was a "person of interest"

The military judge found the NCIS agents did not suspect Appellant of arson when they first interviewed him. Rather, he found the Staff NCO who told SA Papa that Appellant was a "problem child" only offered "a hunch" to the agent and "that hunch need not be imputed to Special Agents [Papa] and [Tango]."[39]

By the agents' actions [and their testimony] we can fairly surmise that their view of Appellant changed significantly in the middle of the initial encounter. Once SA Papa smelled the strong odor of fuel when he inspected

---

[33] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[34] *United States v. Maza*, 73 M.J. 507, 527 (N-M. Ct. Crim. App. 2014).

[35] *Id*. at 528.

[36] *Maza*, 73 M.J. at 528 (citing *United States v. Patane*, 542 U.S. 630 (2004)).

[37] *Edwards v. Arizona*, 451 U.S. 477 (1981).

[38] *Maza*, 73 M.J. at 528 (quoting *United States v. Roa*, 24 M.J. 297, 301 (C.M.A. 1987)).

[39] App. Ex. LXXIX at 7, Court's Essential Findings Conclusions of Law, and Ruling.

Appellant's shoes, his actions indicate that he only then believed Appellant may have "committed an offense." He immediately broke contact so he could discuss the situation with SA Tango. The agents ceased asking him questions until later when they sought his consent to search his room. They only resumed asking him substantive questions after they transported him to the NCIS office and had him execute a written waiver of his Article 31(b) rights.

But whether the agents believed Appellant was a suspect is only half the question. We also determine whether the agents "reasonably should have believed" Appellant had "committed an offense" prior to their initial interaction with him. This objective question is one we review de novo.

Borrowing from Black's Law Dictionary, a "person of interest" is "someone who is the subject of a police investigation or wanted for questioning but who has not been identified by investigators as being *suspected of committing the crime itself*."[40] In criminal investigations, there may be an "inflection point" when a "person of interest" transforms into a "suspect." Any questioning after that inflection point, whether the questioner recognizes it or not, means that "rights warnings are required."[41] The question here is, objectively, when was the inflection point?

At the time the agents first spoke with Appellant, they knew the following: the building had been intentionally burned; there were no signs of forced entry; Appellant was known by his Staff NCO to have a key to the building; he lived very close to the building; he was considered a "problem child" by his Staff NCO; he had recently been counseled by a sergeant in the maintenance shop and had a "bad grudge" against him; and that same sergeant's hardhat and logbook appeared to have been moved to be intentionally burned.

But the agents also knew that other Marines had a key to the building. The reason for going to Appellant's barracks was because he and another Marine known to have a key both lived there. According to SA Tango, they were going to speak to Appellant and other possible key-holders to conduct "screening interviews."[42] A logical first-step in an investigation like this,

---

[40] Black's Law Dictionary (10th ed. 2014) (emphasis added).

[41] *Davis*, 36 M.J. at 340 (quoting *United States v. Schake*, 30 M.J. 314, 317 (C.M.A. 1990)).

[42] R. at 47, 67. ("A screening interview is when you have a big pool of people, you try to narrow down to figure out more concise investigative leads. At that point, we had four or five different people . . . and we were trying to figure out who actually had keys at the time.")

where there were many possible key holders, would be to conduct such screening interviews to see who actually possessed keys versus who did not. Possessing a key to the building cannot automatically make someone a suspect for the purposes of Article 31(b) warnings. That would be to say that anyone with a key, such as the Staff NCO, would objectively have to be assumed to have "committed an offense" and be deemed a "suspect" entitled to rights warnings. It is true that the agents had more information on Appellant than just the possibly he had a key. But we do not consider that additional evidence to be sufficient, even when coupled with Appellant possibly having a key, to make him a suspect. The additional information resulted in "a hunch" by the Staff NCO. The standard of suspicion necessary to invoke the rights advisement requirement must be based on more than "a hunch"[43] that the person committed the offense.

In *United States v. Muirhead*,[44] the appellant brought his six-year-old stepdaughter to a naval hospital's emergency room because she was bleeding from her vaginal area. It was approximately 2130, and she was wearing a nightgown and underwear. The appellant explained to the treating physician, a Naval officer, that he had been watching the girl for a few hours so her mother could go out with friends. According to the appellant, about two hours after her mother left, the girl told him she had placed a mop handle in her vagina. But the doctor came to a different conclusion. When he examined the girl she was "silent, tearful, and nervous."[45] He performed a sexual assault forensic examination and notified NCIS just before midnight. The doctor placed the girl on a medical hold status and suggested that NCIS agents search the appellant's home. Within about three hours, two NCIS agents met the appellant at his home and presented him with a PASS form for the house with the phrase "suspected child abuse" on it. Appellant consented. But the agents also interviewed the appellant without providing Article 31(b) warnings. During the interrogation, he told the agents a more detailed version of what he told the doctor. He opined that his six-year-old stepdaughter stuck a broom in her vagina because she was "horny."[46] The Government used these statements against him at trial.

---

[43] *Swift*, 53 M.J. at 447 (citing *United States v. Meeks*, 41 M.J. 150, 161 (C.M.A. 1994)).

[44] 51 M.J. 94 (C.A.A.F. 1999).

[45] *Id*. at 95.

[46] *Id*. at 96.

CAAF held that even though the agents themselves did not believe the appellant was a suspect entitled to Article 31(b) warnings, they should have believed he was a suspect and they should have provided a rights advisement because the context and circumstances would have led a reasonable person to conclude the appellant was a suspect.

It would strain credulity to conclude that the NCIS agents in *Muirhead* were conducting anything akin to a "screening interview." It would also be impossible to believe that the inflection point in that case had not already occurred when the treating physician's suspicions had been raised to the point where he conducted a sexual assault forensic examination and notified NCIS.

In *United States v. Davis*,[47] Naval Investigative Service agents investigated a death. A young Sailor's body was found behind the enlisted club. It appeared he died of head injuries inflicted by a blunt object. A forensic pathologist informed the agents that the injuries were consistent with being struck by a pool cue. When the agents learned the club did not allow patrons to take the club's pool cues outside, they focused on patrons who were believed to have brought their own pool cues to the club on the night in question. The appellant was one such person of interest.

When the agents interviewed the appellant, they knew he had recently been in an unauthorized absence status and was confined to his ship. They knew he had made remarks about wanting to shoot someone and that he said he "might need to kill a cop."[48] They also knew his command had referred him for a mental health evaluation. Another witness told the agents that the appellant told him that the Sailor had been "hit and jabbed with a pool stick,"[49] information which was not common knowledge. At appellant's ship, the agents waited in an interview room, while a master-at-arms escorted appellant to speak with them. The master-at-arms told the agents that appellant indicated he knew who killed the Sailor but was not going to "tell unless it look[ed] like he was going to get blamed for the death."[50]

---

[47] 36 M.J. 337.

[48] *Id.* at 338.

[49] *Id.* at 339.

[50] *Id.*

When the agents spoke with the appellant, they did not provide him a rights advisement. He was "very cooperative"[51] and confirmed he was at the club that evening. He told the agents he owned two pool cues. When one of the agents asked if they could inspect them, he led them to his girlfriend's car where he left the pool cues so they could do so. The appellant removed the two pool cues from the car, and one of the agents again asked if he could inspect them. The appellant agreed. When he pointed out a spot on the pool cue case, he opined that it "was catsup, but then he said it might be his own blood."[52]

At the point in the *Davis* investigation when the agents first interviewed the appellant and were able to inspect his pool cue, the agents were still conducting screening interviews. They certainly knew negative information about the appellant, but nothing that rose to the level to making him a suspect. The Court of Military Appeals held that "the investigation had not sufficiently narrowed to make appellant a suspect within the meaning of Article 31."[53]

Applying the holdings of those cases to the one before us, we determine that this investigation's inflection point had not been reached until SA Papa inspected and then clearly smelled the fuel on Appellant's shoes. After that, he was a suspect. Before that, he was merely a person of interest. The agents were conducting a screening interview of a person of interest when they asked him questions focused on whether he had a key and his whereabouts during the fire.

We find a comparison with *Davis* apt. The agents, respectively, were trying to narrow down who had his own pool cue or who had a key to the maintenance building. They were also trying to narrow down who might have been at the club or had been around the building that night. The agents in *Davis* had additional information indicating Davis knew things the public did not know about the crime and that he was a bad Sailor. Here, the agents also knew that Appellant's Staff NCO had speculated that Appellant was disgruntled and may have a grudge against the command or his fellow Marines. But in *Davis*, the inflection point had not been reached at the time of the interview, and we similarly find that it had not been reached in this investigation during the initial encounter with Appellant.

---

[51] *Id.*

[52] *Id.*

[53] *Id.* at 341.

Just as Article 31(b) is not designed to have a "comprehensive and unintended reach into all aspects of military life and mission,"[54] it is not the design of the statute to prevent law enforcement from conducting screening interviews of servicemembers who do not yet objectively qualify as suspects. There must be some space for law enforcement to gather information at the outset of an investigation without a requirement that agents give Article 31(b) warnings to every person who could have *possibly* committed the crime under investigation before interviewing them. Though the inflection point is not always so clear in every case, the key analysis remains whether the agents believed or reasonably should have believed that the person being questioned committed an offense. The test is not whether an individual *may have* committed an offense or whether the individual belongs to a group of people who *may have* committed an offense. We believe this terminology best describes Appellant during the initial encounter with the agents.

b. Even if the military judge abused his discretion, the error did not prejudice Appellant

Assuming, arguendo, that the agents violated Article 31(b), we would still find no prejudice. As an initial matter, we conclude that any prejudice would be analyzed as a statutory violation rather than a constitutional one. Following CAAF's holding in *United States v. Evans*,[55] we look to the circumstances of the alleged violation to decide whether prejudice is tested under the "harmless beyond a reasonable doubt" standard for a constitutional violation or the nonconstitutional test for prejudice as found in *United States v. Kerr*.[56] A violation of Article 31(b) violates a statute but does not necessarily violate the Fifth Amendment. Because Article 31(b) offers more protections than the Fifth Amendment, "the Constitution proscribes [a] floor . . . [not] a ceiling."[57]

Appellant was not in custody when he had the initial encounter with the agents. We consider "(1) whether the person appeared for questioning voluntarily; (2) the location and atmosphere of the place in which questioning occurred[;] and (3) the length of the questioning"[58] in concluding that

---

[54] *United States v. Cohen*, 63 M.J. 45, 49 (C.A.A.F. 2006).

[55] 75 M.J. 302 (C.A.A.F. 2016).

[56] 51 M.J. 401, 405 (C.A.A.F. 1999).

[57] *Evans*, 75 M.J. at 305 (alterations in original) (citation omitted).

[58] *Id.* (alteration in original) (quoting *United States v. Chatfield*, 67 M.J. 432, 438 (C.A.A.F. 2009)).

Appellant did not "reasonably believe[ ] that his 'freedom of action [was] curtailed to a degree associated with formal arrest.'"[59] Appellant invited the agents into his room and had a brief and cooperative conversation. He even allowed SA Papa to view his shoes when asked. We also do not see the type of egregious Article 31(b) violation where a servicemember's will is overborne and he or she succumbs to the "subtle pressures" of "military society."[60] The violation also did not produce inculpatory statements that were "not a product of self-determination."[61]

Again, assuming error, we would test for prejudice of a nonconstitutional violation. We evaluate prejudice from an erroneous evidentiary ruling by weighing "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question."[62]

Where this case differs from most is the clarity of how the evidence that was not suppressed was later used at trial. Often an inculpatory statement that is not suppressed is prominently and unambiguously highlighted by the government during trial. Here, before the members, SA Papa testified that during the initial encounter Appellant told him he "was unaware of any incident that occurred at his work."[63] SA Papa also testified that Appellant told him he did not have a key to the building because he had lent it to a friend, who, Appellant implied, had lost it, and that Appellant reported this to his command. The Staff NCO testified that he believed Appellant had a key. The sergeant, whose hardhat and logbook were burned in the fire, testified that Appellant had never told him he had lost his building key.

In the Government's opening statement, the trial counsel said of the initial encounter that Appellant, "when asked . . . says he didn't know anything had happened at the building the night before."[64] But the trial counsel only mentioned the alleged falsehood about the key in the context of the later post-rights advisement NCIS interview. In closing arguments, the

---

[59] *Id*. (alteration in original) (quoting *Schake*, 30 M.J. at 318).

[60] *Jones*, 73 M.J. at 360 (quoting *United States v. Duga*, 10 M.J. 206, 209 (C.M.A. 1981)).

[61] *Evans*, 75 M.J. at 306.

[62] *Kerr*, 51 M.J. at 405.

[63] R. at 586.

[64] *Id*. at 406.

trial counsel briefly mentioned that Appellant was "lying"[65] about not having a key, though that could refer to either the initial interaction or the formal interview. The trial counsel also said, "During the initial interaction, [Appellant] lies in two different ways,"[66] and he referred to Appellant's claims that he was not aware of any incident and that he reported to his command that he gave his key to someone else, who then lost it. In referring to the interview, the trial counsel said, "During that interrogation, his lies continue."[67] These are the only mentions during a closing argument spanning approximately 13 typed pages in the record of trial.

The military judge gave an instruction on false exculpatory statements. But the instruction was a generic one and did not specifically include what the false exculpatory statements were.[68] The overall presentation of evidence and what statements were false was geared much more strongly toward the alleged false alibi Appellant attempted to create with Cpl Tango and not toward the statements from the initial encounter.

The Government's case was strong. Forensic evidence showed the fire was intentionally started without a forced entry into the building. All of the other known key holders had credible alibis. Appellant convinced a friend to lie to NCIS to establish a false alibi for him. The Appellant's clothes, gloves, and shoes smelled like fuel. Forensic testing of the clothes, gloves, and shoes confirmed the presence of fuel, including of a variety that would not correspond to his claimed work on his car. The key card entry log for Appellant's room and proximity to the building indicated he could have started the fire and returned to his room.

The Defense case, on the other hand, was weak. It centered on the possibility that a different person committed the offense and was still possibly at large because of a Humvee fire and dumpster fires on base that occurred while Appellant was in pretrial confinement.

The evidence of the initial encounter was material, but it is mitigated significantly by Appellant's later interrogation, where he agreed to speak to NCIS for two hours. In that interview, he repeated his statements about the building key to the agents. These statements were given after he was read a

---

[65] *Id*. at 1273.

[66] *Id*. at 1276.

[67] *Id*.

[68] *Id*. at 1255. The military judge referred to the Instruction as "generic."

rights advisement and executed a rights waiver form. During that interrogation, Appellant voluntarily doubled down on his earlier statements. There is no indication from the video interview, or the circumstances generally, that Appellant repeated those statements because the "cat was out of the bag."[69]

The quality of the evidence was credible, but again, its prejudice was mitigated by the subsequent NCIS interview. While the first consent search by NCIS of Appellant's room did not discover the building key, the second search—also consented to by Appellant—did. It stands to reason that Appellant either had already hidden the key prior to the initial encounter, but the agents did not find it, or he concealed it after the NCIS interview but before he consented to the second search. The discovery of the key allowed the Government to argue that the statements from the initial encounter were "lies." But Appellant consented to the search that led to the discovery of that very key.

The Government called 15 witnesses and had 30 exhibits admitted into evidence. While the evidence from the initial encounter was presented to the members, it was a single brick in a large wall. Even after removing that brick, the wall remains intact. If there was error, we find no error that was materially prejudicial to Appellant's substantial rights. Indeed, we find any error in this regard to be harmless beyond a reasonable doubt.

*4. Special Agent Papa's questions were seeking consent and were not investigative questions requiring a rights advisement*

Even if the military judge erred in concluding Appellant was not a suspect, the statements in the initial discussion were generally innocuous, and the discovery of the incriminating shoes was still lawful. There was no "poisonous tree" in this case. All of the subsequent evidence, whether from the initial consent search of Appellant's room, the interview at the NCIS office after Appellant waived his Article 31(b) rights, or the second consent search of Appellant's room, was obtained lawfully.

Appellant twice invited SA Papa into the room—first when the agents arrived to find the deadbolt holding the door open and again after the agents requested he come to the door and identified themselves before they accepted his invitation to enter. He did not put any restrictions on where SA Papa or SA Tango could go. For officer safety, SA Papa moved to the rear of the room to ensure no one else was in the bathroom, as its interior was not visible.

---

[69] *See United States v. Murphy*, 39 M.J. 486, 488 (C.A.A.F. 1994).

From there, he asked, "Hey, are those Nikes?" when he saw what appeared to be Appellant's shoes hanging on towel hooks in plain view. This is not a question, in this context, that calls for an inculpatory answer. For example, the agents had no information at that point suggesting that the arsonist had worn Nike shoes or that Nike shoes had been taken from the crime scene.

Appellant states in his brief that the question was, "Hey, are those *your* Nikes?"[70] Even if that were so—and it very well could have been the case—in this context, it does not call for incriminating information, but is merely a prefatory question to seeking consent. When Appellant answered that the shoes were his, the next question from SA Papa was a consent-seeking question, "Do you mind if I go and take a look at them?" to which Appellant granted consent. Thus, the initial question about the shoes was part and parcel of the request for consent. It was properly structured to establish that Appellant was someone who was authorized to grant consent, which would not necessarily have been the case if the shoes belonged to a roommate or other third person. It is also critical that SA Papa did not smell a strong odor—if he smelled any odor at all—from outside the bathroom so as to yet suspect a connection of the shoes to the offense.

In *United States v. Robinson*,[71] CAAF held that even after a suspect invoked his right to silence and his right to speak with an attorney, it was not improper for an agent to seek his consent to search his phone, have him sign a written consent form, and ask him for the numerical code to unlock his phone. Once a suspect invokes his right to counsel, under the Supreme Court's decision in *Edwards v. Arizona*,[72] all interrogatory questioning must cease. However, "requesting consent to search property in which a suspect has an interest is not prohibited by his prior request for counsel, because *Edwards* provides protection only as to interrogation."[73]

Similarly, we hold that the same exception applies to requesting consent to search property, even without the *Edwards* prophylactic rule in place. If an agent may seek consent after the invocation of counsel, then an agent may

---

[70] Appellant's Brief of 21 October 2019 at 6 (emphasis added). SA Tango testified that SA Papa asked of Appellant, "Hey, are those Nikes?" R. at 50.

[71] 77 M.J. 303 (C.A.A.F. 2018).

[72] 451 U.S. 477 (1981).

[73] *Robinson*, 77 M.J. at 306 (quoting *United States v. Burns*, 33 M.J. 316, 320 (C.M.A. 1991)).

properly seek consent from a suspect even during questioning that is unlawful solely because of a failure to provide Article 31(b) warnings.

Had SA Papa smelled a gasoline odor from outside the bathroom, to the point where his suspicion was clearly aroused and the shoes appeared to be evidence of a crime, then his questioning Appellant of his ownership of the shoes would have called for inculpatory information and therefore would have required a rights warning. Appellant points to a 1954 Court of Military Appeals case, *United States v. Taylor*,[74] for the proposition that an agent's questions about ownership of clothing can violate Article 31(b). Context is in order. In *Taylor*, agents had reason to believe the appellant possessed marijuana in quarters that he shared with at least one other person. Agents arrived and, without providing Article 31(b) warnings to Taylor, asked him to identify which jackets hanging on a row of pegs were his. One of the overcoats he identified as his contained two marijuana cigarettes.

The court reversed the conviction because the agents were not posing an innocuous question when they asked the appellant to identify his clothing. They already suspected him of possessing marijuana and this question "regard[ed]"[75] the offense for which agents suspected him. The questions were specifically geared toward identifying a property interest in clothing that may have contained contraband. In a circumstance in which a particular article of clothing could have belonged to others with access to the room in *Taylor*, questioning about ownership of individual clothing items constituted an interrogation designed to develop substantive evidence of the crime under investigation—constructive possession of marijuana.

Here, the crime under investigation was not possession (or theft) of Nike shoes. From his vantage point outside the bathroom, SA Papa appeared to just be curious about generic shoes that were hanging on a towel rack. Had he smelled a strong odor of fuel prior to seeking to ascertain that Appellant owned the shoes, there might be a different conclusion. We are satisfied that SA Papa's testimony on the suppression motion resolved any confusion from the NCIS report of investigation concerning whether he smelled a strong odor of fuel before asking to inspect the shoes or after getting close to them. He

---

[74] 17 C.M.R. 178 (C.M.A. 1954).

[75] *Id*. at 182.

was certain that he only smelled what he believed was fuel as he got close to the shoes.[76]

Because Appellant invited the agents into his room and gave consent for SA Papa to inspect what ultimately turned out to be his fuel-soaked shoes, there was no violation of Article 31(b). It was the realization that Appellant's shoes smelled like fuel that most clearly transformed him from a person of interest into a suspect. After becoming a suspect, he (1) consented to a search of his room that revealed nearly-dispositive evidence for the Government in the form of fuel-soaked shoes, clothes, and gloves; (2) consented to an interview where he gave a false alibi about his whereabouts with his friend and a false exculpatory statement that his clothes smelled of fuel from working on his car; and (3) consented to a second search of his room that uncovered the key to the crime scene that he said he had lost. We find no abuse of discretion by the military judge in admitting the evidence from the search of Appellant's room.

## B. The Trial Defense Counsel Were Not Ineffective

Appellant asserts his TDC were ineffective for two reasons: (1) because they failed to move to suppress the fruits of the first room search after SA Papa had unlawfully apprehended Appellant, and (2) because they failed to investigate the extent of un-warned statements Appellant made during the car ride to the NCIS office and then also failed to move to suppress the subsequent interrogation as unlawful because Appellant's waiver was not voluntary.

We review claims of ineffective assistance of counsel de novo.[77] In *Strickland v. Washington*,[78] the Supreme Court laid out the test that guides our

---

[76] In his NCIS report, SA Papa wrote, "I could also detect a faint odor of what I recognized to be fuel or gasoline in the bathroom area. Then I asked [Appellant] if I could take a closer look at the shoes, and he stated to the affirmative." App. Ex. XIII at 8. During the motions hearing, SA Papa was cross-examined on this and clarified that he did not smell fuel from the shoes prior to entering the bathroom and inspecting them. The military judge's Findings of Fact, written four months after the conclusion of the trial and five months after the motions hearing, state that SA Papa "noted the shoes appeared to be damp and he smelled a faint odor of fuel or gasoline in the bathroom area." And then after inspecting the shoes, SA Papa noted a "strong odor of what he believed to be diesel or jet fuel." App. Ex. LXXIX at 7, Court's Essential Findings Conclusions of Law, and Ruling at 3.

[77] *United States v. Harpole*, 77 M.J. 231, 236 (C.A.A.F. 2018).

[78] 466 U.S. 668 (1984).

analysis. In order to prevail on such a claim, "an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice."[79] The Appellant bears the "burden of establishing the truth of factual matters relevant to the claim."[80] Only after an appellant has met his burden and has demonstrated both deficiency and prejudice can we find in the appellant's favor on an ineffective assistance of counsel claim.

Here, Appellant's TDC were not ineffective because the underlying actions Appellant complains of were not violations of his rights. Any motion to suppress based on these alleged violations did not have a "reasonable probability" of success, which is "a probability sufficient to undermine confidence in the outcome,"[81] and could not have resulted in any prejudice to Appellant.

*1. Appellant's brief apprehension was unlawful but did not taint his consent to the search of his room*

Appellant argues that when SA Papa briefly handcuffed him and led him up to his barracks room, he unlawfully apprehended him, which tainted the first consent-search of his room. As an initial matter, there was nothing unlawful about SA Papa's stopping and frisking Appellant. SA Papa testified that he was concerned that Appellant's hands were in his pocket and that he was slow to take them out. He told Appellant, "Hey, you're making me real nervous right now, and we want to talk to you some more."[82] At this moment, he also recalled that in the initial encounter up in his room, SA Tango had to ask Appellant, more than once, to remove his hands from his pockets. Thus, it was lawful for SA Tango to stop and frisk Appellant, and even to place handcuffs on him while doing so.[83]

---

[79] *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687).

[80] *Denedo v. United States*, 66 M.J. 114, 128 (C.A.A.F. 2008), *aff'd*, 556 U.S. 904 (2009).

[81] *Id.* at 694; *see also United States v. Jameson*, 65 M.J. 160, 161-62 (C.A.A.F. 2007). The standard for which we consider a motion to suppress that was not filed due to ineffective assistance of counsel is something less than the preponderance of the evidence standard for the same motion had it been raised at trial.

[82] R. at 77.

[83] *See Terry v. Ohio*, 392 U.S. 1, 27 (1968) (allowing a reasonable search for weapons by law enforcement officials, noting that they "need not be absolutely

But SA Papa had no reason after he stopped and frisked Appellant to apprehend him. He had determined there was no threat. An individual may only be apprehended upon probable cause, which exists "when there are reasonable grounds to believe that an offense has been or is being committed and the person to be apprehended committed or is committing it."[84] SA Papa and SA Tango both opined that when they requested a PASS for Appellant's room, they did not believe they had probable cause. SA Papa's brief apprehension of Appellant was unlawful.

The question is twofold: (1) whether this brief unlawful apprehension vitiated Appellant's PASS, and (2) whether Appellant's TDC was ineffective for not pursuing suppression under this theory. We answer both in the negative.

After taking Appellant back up to his room in handcuffs, SA Tango asked him if they could conduct a search. It is not perfectly clear from the record if Appellant was asked this while still in handcuffs. SA Papa testified that he "believe[s]" Appellant was asked for consent after he was released from the handcuffs. SA Tango only testified that she remembered Appellant and SA Papa:

> coming back up the stairs. And that's when we asked [Appellant], we told him, "Hey, we're looking into the arson. We would like to search your room. Do you have anything against that?" And we read him the standard wording on a permissive authorization for search and seizure, in which he signed, initialed next to everything stating he understood, and gave us permission to enter and search his room.[85]

But in his post-trial Declaration, Appellant swears he agreed to the search when he was still in handcuffs.

Again, we look to the totality of the circumstances to determine whether consent was voluntary, and specifically consider several factors, including (1) the degree to which Appellant's liberty was restricted; (2) the presence of coercion or intimidation; (3) Appellant's awareness of his right to refuse

---

certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger").

[84] Rule for Courts-Martial 302(c); *United States v. Darnall*, 76 M.J. 326, 329-30 (C.A.A.F. 2017).

[85] R. at 52-3.

consent; (4) Appellant's mental state at the time; (5) his consultation, or lack thereof, with counsel; and (6) the coercive effects of any prior violations of his rights.[86]

Appellant's apprehension was very limited in duration and lasted, according to SA Papa, "seconds, maybe a minute, enough to go up the stairs."[87] It ended when SA Papa was reunited with his partner, whom he believed was waiting for him up at Appellant's door. The agents did not ask any questions seeking inculpatory information after the brief apprehension, but only sought consent for a search. Given that Appellant was provided a PASS form, even had he verbally consented when still handcuffed, the agents were clearly relying on his written authorization. Appellant was surely not handcuffed as he initialed the PASS form—eight times—and then signed his name and wrote the date and time.

Appellant's detention during the stop-and-frisk was minimal in nature and pertained to officer safety, and the ensuing unlawful apprehension was extremely brief and without incident. Because Appellant appeared to fully understand his right to refuse consent to search his barracks room, we conclude that his consent was voluntary. We also conclude that any motion to suppress was without a reasonable probability of success.

*2. Whatever pre-advisement conversation occurred on the way to the NCIS office did not fall within the ambit of Article 31(b)*

Appellant argues that the video of his interrogation indicates the NCIS agents questioned him in the car ride to the NCIS office. The video showed SA Tango referring to things Appellant said "in the car" concerning how he "hated" the Marine Corps, wanted to leave the Marine Corps to make money, and did not get along with certain people in his command.

Article 31(b) covers answers to questions, not spontaneous statements or statements made in general conversation not related to questions asked in a law enforcement capacity.[88] From a review of the video interview, we conclude that any statements Appellant made in the car ride to the NCIS office were either spontaneous or responses to questions from the agents that did not seek incriminating information. His statements about disliking the

---

[86] *United States v. Olson*, 74 M.J. 132, 134-35 (C.A.A.F. 2015).

[87] R. at 112.

[88] *See United States v. Lichtenhan*, 40 M.J. 466, 470 (C.M.A. 1994); *United States v. Vitale*, 34 M.J. 210, 212 (C.M.A. 1992).

Marine Corps appear to have been responsive to "rapport building" by the agents or just Appellant's idle chatter. They were not covered by Article 31(b). Not only was TDC not deficient to further investigate what was said, this chatter did not appear to vitiate Appellant's later consent to be interviewed.

*3. Appellant's alleged invocation of his right to counsel was not clear and unambiguous*

Appellant also argues his consent to an interview was vitiated because he invoked his right to counsel in the car. In his post-trial declaration, Appellant states he said, "This seems like the point of the movie where the guy asks for a lawyer."[89] He claims one of the agents said in response, "Well, I can't give you legal advice but if you did nothing wrong, you don't need a lawyer."[90]

Even accepting Appellant's version of events, this did not amount to a clear invocation of a right to counsel and an unambiguous expression to deal with law enforcement "only through counsel."[91] The burden to make such a clear invocation rests with Appellant and any invocation must be "sufficiently clear[ ] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[92]

We look to events surrounding an alleged invocation of rights for context.[93] We conclude this conversation was part of rapport building on the ride to the NCIS office and did not rise to the level of an interrogation and Appellant's purported comments did not constitute an invocation. Though it is "good police practice"[94] for law enforcement agents to clarify an ambiguous invocation of the right to counsel, they have no requirement to do so. Afterwards, Appellant was advised of his Article 31(b) rights and agreed to make a statement. His video-recorded interview lasted about two hours. In

---

[89] Appellant's Declaration at 3.

[90] *Id.*

[91] *United States v. Hutchins*, 72 M.J. 294, 297 (C.A.A.F. 2013) (quoting *Edwards*, 451 U.S. at 484-85).

[92] *United States v. Delarosa*, 67 M.J. 318, 324 (C.A.A.F. 2009) (alteration in original) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)).

[93] *Id.* (discussing the extent to which courts examine context surrounding whether an invocation may be characterized as ambiguous or not).

[94] *Davis*, 512 U.S. at 461.

the video, Appellant showed no signs of hesitation or that he was being or had previously been coerced.

Had Appellant moved to suppress his statement to law enforcement at trial, it had no "reasonable probability" of success.[95] Moreover, even had his statements been suppressed, the Government still would have had a significant amount of damning evidence, including the fuel-soaked shoes and other clothing items and the key-card swipe to Appellant's room showing entry shortly after the building fire alarm was triggered.

## III. CONCLUSION

After careful consideration of the entire record of trial, and the briefs from both parties, we have determined the approved findings and sentence are correct in law and fact and find no error materially prejudicial to Appellant's substantial rights occurred.[96] Accordingly, the findings and sentence as approved by the convening authority are **AFFIRMED.**

Chief Judge MONAHAN and Judge LAWRENCE concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[95] *Strickland*, 466 U.S. at 694; *see also Jameson*, 65 M.J. at 161-62.

[96] UCMJ arts. 59, 66.